IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| WILLIAM A. ROBERTS, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )    Case No. 3:07-1028 |
| | )    Judge Trauger |
| NOVARTIS ANIMAL HEALTH US, INC., | ) |
| | ) |
|     Defendant. | ) |
| | ) |

## MEMORANDUM

Pending before the court is the defendant's Motion for Summary Judgment (Docket No. 18.) For the reasons discussed herein, the defendant's Motion for Summary Judgment will be granted.

## FACTUAL AND PROCEDURAL BACKGROUND

The defendant, Novartis Animal Health US, Inc. ("Novartis"), manufactures and sells veterinary medications.[1] On August 12, 2002, Dennis Truesdell who, at that time, was a Novartis District Manager, hired the plaintiff, William A. Roberts, to work at Novartis as a Senior Territory Manager. At the time of his hire, the plaintiff was fifty-five years old. The

---

[1] Unless otherwise noted, the facts are drawn from the parties' summary judgment briefs (Docket Nos. 23, 28, and 31), the plaintiff's Response to Defendant's Statement of Undisputed Material Facts (Docket No. 30) and related affidavits and exhibits. Although facts are drawn from submissions made by both parties, on a motion for summary judgment, all inferences are drawn in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

1

plaintiff, who had built a successful career in veterinary medicine sales prior to joining Novartis, had a productive next several years selling veterinary medications for Novartis.

In early 2006, Novartis announced "Project Blaze," *i.e.*, a nationwide reorganization of its sales territories to be effective on January 1, 2007. As part of the "Project Blaze" reorganization, the plaintiff was assigned to Project Blaze Territory 421, which is comprised of eastern and southern middle Tennessee, including Brentwood, Tennessee, where the plaintiff lived with his wife. In April 2006, the plaintiff told his district manager, Jeff Rayner, that he was interested in changing sales territories to Project Blaze Territory 422, which is comprised of northern middle Tennessee and southern middle Kentucky. The plaintiff had decided that he wanted to purchase farm land in that area. Rayner told the plaintiff that, if he decided to go through with changing sales territories, he would have to relocate to that sales territory at his own expense. The plaintiff told Rayner that he was comfortable with relocating. In late April 2006 and again in May 2006, Rayner sought to reconfirm with the plaintiff that he did, in fact, wish to change sales territories, and, on each occasion, the plaintiff indicated that he did. After this, Rayner informed Truesdell, who was now the Southeast Regional Director, of the plaintiff's request to change territories. Truesdell approved the request, effective January 1, 2007.

While there is apparently no written, formalized Novartis policy on the issue, the "rule of thumb" at Novartis is that salespeople like the plaintiff are supposed to live in their sales territories. (Docket No. 18 Ex. 3 at 12-13.) According to Truesdell, exceptions to this general rule "are occasionally made under special and limited circumstances." (Docket No. 19 at 3.) While the plaintiff understood this general rule, he initially only believed that he was supposed

2

to move into his new sales territory at some convenient time in the not too distant future. The plaintiff also believed that, because he lived in Brentwood, Tennessee, there was less urgency to move because it is not difficult to quickly reach Project Blaze Territory 422 from his Brentwood home in Territory 421.

When the plaintiff had not relocated by late January 2007, the plaintiff's new district manager, Jamie Sanderson, began to pressure the plaintiff to do so. Over the next few months, Sanderson, Truesdell and the plaintiff had numerous discussions about how the plaintiff's housing search was going and when, precisely, the plaintiff planned to move. During these conversations, Sanderson and Truesdell strongly encouraged the plaintiff to find a new place within Project Blaze Territory 422 to live and to move to it. The plaintiff consistently responded that he was trying to find a place, but that he and his wife had not yet found a suitable location for their new family home. The conclusion of many of these conversations was that the plaintiff needed more time to complete his relocation. Sanderson and Truesdell grudgingly accepted that.

In late April 2007, the plaintiff told Truesdell that he wished to hold off on the relocation while waiting to see if a position with Novartis' Farm Animal division opened up in the western portion of the United States, something the plaintiff thought might happen by June 2007. After making some phone calls within Novartis, Truesdell quickly determined that no such position would become available within this time frame, and he informed the plaintiff via e-mail, copying Sanderson, that "I will not support any further delay in your move to your territory." (Docket No. 20 Ex. E.) Sanderson and the plaintiff spoke on April 30, 2007, and they agreed that the

3

plaintiff would be relocated by June 1, 2007. On May 1, 2007, Sanderson confirmed that conversation via e-mail, copying Truesdell, informing the plaintiff that June 1, 2007 "is a final move date. We have passed the point of being able to continue to push back the date of your relocation. I fully expect that you will be relocated to live within the boundaries of your territory by June 1, 2007 and that you will provide me with weekly feedback as to the progress of your move." (Docket No. 20 Ex. G.) In a sharp response to both Sanderson and Truesdell, the plaintiff wrote that, when he decided to switch to Territory 422, "it did not dawn on me that living as close to the new territory as I do would be viewed as adversely as living in Cleveland, Ohio." (Docket No. 20 Ex. H.) The plaintiff added that "I will have a new residence in my new territory by June 1." (*Id.*)

After providing Sanderson with vague updates on the progress of his search throughout May 2007, the plaintiff wrote Sanderson on May 28, 2007, and provided a "new address" in Gallatin, Tennessee, within Project Blaze Territory 422. (Docket No. 20 Ex. K.) In fact, during that month, the plaintiff had contacted a friend who owned a veterinary clinic in Gallatin, and the plaintiff asked that friend, Dr. Bondurant, if he could use the clinic's address as his home address for work purposes. Dr. Bondurant apparently agreed. Technically, the address that the plaintiff provided to Sanderson and Truesdell was not actually the address of Bondurant's clinic but was the address of a private post office next door, which the plaintiff used as his work mailing address "to avoid confusion in [Bondurant's] clinic." (Docket No. 30 at. 5.) The clinic did have a small efficiency apartment in the back, but the plaintiff concedes that he never used the efficiency, had no lease agreement with Bondurant and never paid rent. Sanderson and

4

Truesdell, not knowing of the plaintiff's arrangement with Bondurant and believing that the plaintiff now resided within his sales territory, dropped the issue.

In July 2007, based on a comment made by another territory manager, Sanderson began to believe that the plaintiff had not actually relocated. Suspecting that the plaintiff was still living outside of his sales territory, Sanderson went to the Gallatin address that the plaintiff had provided. Sanderson noted that there was only a private post office at that address. Sanderson reported his findings to Truesdell and the human resources department at Novartis. Sanderson and Truesdell agreed to confront the plaintiff about the issue at his mid-year review on August 10, 2007.

At that August 10 meeting, Sanderson and Truesdell presented a highly critical review of the plaintiff's work performance, which was inconsistent with the positive reviews that the plaintiff had received in previous years. This review criticized the plaintiff's negative attitude about his sales goals and his deliberate pace in selecting a new residence. (Docket No. 20 Ex. M.) When the discussion turned to the plaintiff's living arrangements, the plaintiff initially indicated that he lived in the efficiency at the back of Bondurant's clinic. After intense questioning, however, the plaintiff conceded that he did not reside at Bondurant's clinic and that he had only provided the Gallatin address to get Sanderson and Truesdell "off his back." (Docket No. 19 at 7.) Sanderson and Truesdell advised the plaintiff that they would be back in touch with him as to how they wished to proceed in light of this information.

On August 27, 2007, Sanderson and Truesdell advised the plaintiff that he was being terminated, effective immediately. The "script" that Sanderson read the plaintiff stated that

5

"[t]he Company has made the decision to terminate your employment based on your admission of deceiving Dennis and me regarding having moved into your territory after initially misleading us about this, as well as the performance issues we reviewed with you when we last met." (Docket No. 20 Ex. O.) According to Sanderson's notes of the meeting, the plaintiff taped much of the conversation and, when it became clear that he was going to be terminated, the plaintiff told Sanderson and Truesdell, "if you want to go to war we will go to war because I have taken the high road on this." (Docket No. 20 Ex. P.) The plaintiff was replaced by Carla Smith, a woman who, at age thirty-eight, is more than twenty years younger than the plaintiff.

On September 11, 2007, the plaintiff filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"), asserting discrimination based on age and asserting retaliatory discharge. (Docket No. 22 Ex. A.) Specifically, the plaintiff alleged that older employees at Novartis were given higher sales goals than younger employees and that younger employees were not required to live within their sales territories. (*Id*.) The plaintiff asserted that he complained about this during his August 2007 evaluation, and, because of his complaints and his age, he was terminated. (*Id*.)

On November 1, 2007, the plaintiff filed his operative Complaint in this case, alleging age and gender discrimination under the ADEA, Title VII and the Tennessee Human Rights Act (THRA). (Docket No. 4 at 1.) While not explicitly asserting a claim for retaliatory discharge, the plaintiff re-asserted that he had complained that younger employees were not held to the same requirements as older employees and that he was fired within a week of making that allegation. (*Id*. at 2.) On July 31, 2008, Novartis moved for summary judgment on all of the

6

plaintiff's claims.

## ANALYSIS

The plaintiff claims that he was subjected to discrimination on the basis of his age and his gender in violation of the Age Discrimination in Employment Act (ADEA) of 1967, 29 U.S.C. § 621 *et seq.*, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Tennessee Human Rights Act, T.C.A. § 4-21-301 *et seq*. The defendant has moved for summary judgment on the plaintiff's claims. For the reasons discussed below, the defendant is entitled to a judgment as a matter of law, and the defendant's motion will be granted.

### I. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail, the moving party must meet the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). "The court's function is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a

genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

If the non-moving party fails to make a sufficient showing on an essential element of the case with respect to which she has the burden, however, the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999). To preclude summary judgment, the non-moving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252). If the evidence offered by the non-moving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the non-moving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249-52. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 431 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 247-49).

## II. The Plaintiff's Discrimination Claims

### A. Federal Gender Discrimination and Retaliation Claims

At the outset, it is important to clarify which of the plaintiff's claims are still subject to dispute. As noted above, in the operative Complaint, the plaintiff specifically alleged gender and age discrimination under federal law and the THRA. Additionally, the plaintiff included a claim

8

of retaliatory discharge in his EEOC Charge, and, in the operative Complaint, the plaintiff, without specifically alleging "retaliation," claimed that he was fired, in part, for complaining that younger Novartis employees had lower sales goals. (Docket No. 4 at 2.)

The plaintiff's gender discrimination claim under federal law (Title VII) is not sustainable. "Federal courts do not have subject matter jurisdiction to hear Title VII claims unless the claimant explicitly files the claim in an EEOC charge or the claim can reasonably be expected to grow out of the EEOC Charge." *Abeita v. TransAmerica Mailings, Inc.*, 159 F.3d 246, 254 (6th Cir. 1998). Here, it is undisputed that the plaintiff failed to assert gender discrimination under Title VII in his EEOC Charge, and there is nothing to suggest that gender discrimination could be reasonably expected to grow out of the charge filed. (Docket No. 30 at 10; Docket No. 22 Ex. A.) The plaintiff has not challenged this line of reasoning in briefing and has apparently conceded this claim. Therefore, the defendant is entitled to summary judgment on the plaintiff's Title VII gender discrimination claim.

As to any retaliation claims, to establish a *prima facie* case of retaliation, the plaintiff would have to show, among other things, that he engaged in a protected activity and that there was a causal connection between the adverse employment action and that protected activity. *Weigel v. Baptist Hosp. of East Tennessee*, 302 F.3d 367, 381 (6th Cir. 2002). The plaintiff concedes that he never expressed a feeling that he was being discriminated against to his employers at Novartis, even when complaining about his high sales goals. (Docket No. 30 at 10.) Without any indication that, during his employment, the plaintiff apprised his employers (or anyone else for that matter) that he opposed any unlawful employment practice, the plaintiff

9

cannot demonstrate that he engaged in any "protected activity" and, therefore, cannot establish a *prima facie* case of retaliatory discharge. *Fox v. Eagle Distrib. Co.*, 2007 U.S. App. LEXIS 28887, at *10 (6th Cir. Dec. 14, 2007) (citing *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989)). The plaintiff has not challenged this line of reasoning in briefing and has apparently conceded this claim. Therefore, to the extent that the plaintiff has asserted claims of retaliatory discharge, those claims are not sustainable and the defendant is entitled to summary judgment on those claims.

### B. Plaintiff's Age Discrimination Claims

The plaintiff's ADEA and THRA age discrimination claims are analyzed according to the same framework as federal discrimination claims under Title VII. *Policastro v. Northwest Airlines*, 297 F.3d 535, 538-39 (6th Cir. 2002) (ADEA); *Lynch v. City of Jellico*, 205 S.W.3d 384, 399 (Tenn. 2006) (THRA). That is, where, as here, there is no direct evidence of discrimination, a claim of age discrimination is analyzed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Id.* Under the framework, the plaintiff must first establish a *prima facie* case of discrimination. *Grosjean v. First Energy Corp.*, 349 F.3d 332, 335 (6th Cir. 2003). If the plaintiff establishes his *prima facie* case, the defendant may articulate a legitimate, non-discriminatory reason for the employment action, which the plaintiff may rebut with evidence that the explanation is pretextual. *Id.*

#### 1. *Prima Facie* Case

In order to prove a *prima facie* case of age discrimination, the plaintiff must show (1) that he is at least 40 years old; (2) that he was subject to an adverse employment decision; (3) that he

10

was qualified for the position; and (4) that he was replaced by a significantly younger person. *Grosjean*, 349 F.3d at 335. The defendant essentially concedes that the plaintiff has established his *prima facie* case, not disputing that the plaintiff, who was sixty at the time of his termination, was fired from a job he was qualified for and replaced by a 38-year-old. (Docket No. 31 at 2-3.)

### 2. Non-Discriminatory Reason For Adverse Action

As the plaintiff has established his *prima facie* case of age discrimination, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *Grosjean*, 349 F.3d at 335. As discussed above, the defendant has repeatedly stated, both at the time of the plaintiff's termination and during this litigation, that the plaintiff was terminated because the plaintiff admitted to deceiving his superiors about having moved into his sales territory. (Docket No. 23 at 16.) The severity of the plaintiff's conduct is shown by the facts discussed above. Over the first half of 2007, Sanderson and Truesdell repeatedly impressed upon the plaintiff that it was important that he quickly move to his sales territory, but they were also patient with what they perceived as the plaintiff's "dawdling." When Sanderson and Truesdell finally demanded a date certain for the plaintiff's relocation, the plaintiff, rather than actually finding a new place to live, essentially invented a home address and allowed his employers to believe that he lived there. The record shows that the plaintiff was dishonest with his superiors about a matter that was of great importance to them. This dishonesty continued for two-and-one-half months, until the plaintiff finally confessed to his chicanery under intense questioning. The defendant has easily satisfied its burden to establish a legitimate, non-discriminatory reason for the adverse action.

11

### 3.     Pretext

As the defendant has come forth with a legitimate, non-discriminatory reason for the adverse employment action, the burden now shifts back to the plaintiff to "produce sufficient evidence from which the jury may reasonably reject the employer's explanation" for the adverse employment action, *i.e.*, conclude that the explanation is pretext for discrimination. *Grosjean*, 349 F.3d at 335. To demonstrate pretext, the plaintiff may show that the articulated reason either (1) has no basis in fact, (2) did not actually motivate the defendant, or (3) is insufficient to explain the defendant's actions. *See Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 573 (6th Cir. 2000).

To demonstrate pretext, the plaintiff offers a lot of speculation and innuendo, but nothing that would cause a reasonable jury to reject the defendant's explanation for the termination decision. Primarily, the plaintiff contends that he was actually fired so the defendant would not have to pay him full pension benefits when he turned sixty-two. (Docket No. 28 at 2.) The plaintiff contends this "huge financial coup," (stemming from the defendant's discriminatory animus) is the only plausible explanation for his termination. (*Id*.) Without this explanation, the plaintiff argues, the defendant's pressure for him to move makes little sense, particularly when the plaintiff lived a short distance from Territory 422 and there are at least five, younger individuals who were not required to move within their territories. (*Id.* at 6-8.) Furthermore, the plaintiff argues, he never actually lied to his superiors, because he only stated that he "ha[d] a residence and address" in his territory. (*Id*. at 7.) Finally, the plaintiff argues that his 2007 sales goals and performance review were so inconsistent with past goals and reviews that they clearly

12

indicate that the defendant was trying to force him out. (*Id.* at 10-11.)

The plaintiff's theory fails to undercut the defendant's explanation for the adverse employment action. The record indicates that, no matter his age, the plaintiff would not have been fired unless he had deceived his superiors about where he lived. Even Sanderson's profoundly negative 2007 mid-year review states that he will be "glad to work with" with the plaintiff to get him back on the right track. (Docket No. 20 Ex. M.) Further, while the plaintiff may not have ever flatly lied, he knowingly allowed his superiors to operate under a misconception about an issue they felt was important. The plaintiff's arguments about the "financial coup" stemming from his departure and his assertions that Sanderson and Truesdell were making things more difficult for him are not important in light of the fact that the adverse employment action at issue here, the plaintiff's termination, came about because he was dishonest with his employer.

Further, that the plaintiff claims to have located five Novartis employees who were not required to move immediately into their sales territories does not help him to establish pretext here. First, as to one of those employees, Mr. Clark, the plaintiff testified at his deposition that he no longer contends Mr. Clark lived outside of his sales territory. (Docket No. 18 Ex. B. at 250.) As to another employee, Ms. Ducinda, the plaintiff's belief is solely based on the speculation of a friend, Ralph McCrery, about where Ms. Ducinda lived vis-a-vis her territory. (*Id.* at 235.) Also, Ms. Ducinda was a district manager, not a territory manager like the plaintiff, and she performed a different role for Novartis in a different part of the country. (*Id.*) As to the three territory managers that the plaintiff contends were allowed to live outside their territories, it

13

is clear that Ms. Heath, Ms. Paige and Ms. Dorney worked in completely different areas of the country for different supervisors but, like the plaintiff, received special work arrangements based on their unique circumstances. (Docket No. 31 at 6.) For instance, in 2007, Ms. Dorney was permitted to remain in Charlottesville, Virginia, despite the fact that Charlottesville was outside of her new Richmond, Virginia, territory because it was more convenient for her during the period that her husband finished law school. But there was a mutual understanding between Novartis and Ms. Dorney that she would move to Richmond once her husband started working in Richmond, and she did. (Docket No. 18 Ex. G at 5.) The plaintiff has not come forward with any Novartis employee who, like the plaintiff, languished indefinitely without excuse outside of his or her sales territory, and the plaintiff has certainly not come forward with any employee who was dishonest with the defendant about living in his or her sales territory.

In sum, the plaintiff has presented no evidence such that a reasonable jury could conclude that the defendant's proffered explanation is pretextual. Therefore, the defendant is entitled to summary judgment on the plaintiff's age discrimination claims.

### C. Plaintiff's THRA Reverse Gender Discrimination Claim

As noted above, discrimination claims under the THRA are analyzed according to the same framework as federal discrimination claims under Title VII. *Lynch*, 205 S.W.3d at 399. Therefore, the plaintiff's THRA reverse gender discrimination claim is analyzed under the same general burden-shifting framework discussed above in the age discrimination context. The only distinction is that, in the reverse discrimination context, the plaintiff must "demonstrate background circumstances to support the suspicion that the defendant is that unusual employer

14

who discriminates against the majority." *See Zambetti v. Cuyahoga Community College*, 314 F.3d 249, 255 (6th Cir. 2002). These "background circumstances" are frequently shown by demonstrating that the employer has a history of reverse discrimination. *Id.* at 256.

Here, the "background circumstances" fail to "support the suspicion" that the defendant discriminates against men. In his response brief, the plaintiff makes no colorable argument that Novartis has a history of discriminating against men. As discussed above, in his response brief, the plaintiff only offers isolated examples of at most five scattered employees of various rank in the company (most of whom are female) who were not required to move into their sales territory immediately after they began working there. (Docket No. 28 at 7-12.) Assuming these examples are relevant, they do not indicate the "background circumstances" of reverse gender discrimination. Rather, they show that these employees, such as Ms. Dorney, were treated in essentially the same manner as the plaintiff. That is, the company pushed employees to move into their sales territories but was flexible based on individual and special circumstances. Like these employees, the plaintiff was not required to move into his sales territory immediately, and the record shows that he was not fired for failing to do so; he was fired for having deceived his superiors about whether he had moved. (Docket No. 31 at 3-7.) Because the plaintiff has failed to establish his *prima facie* case of reverse gender discrimination, the defendant is entitled to summary judgment on that claim as well.[2]

---

[2] Even if the plaintiff had somehow been able to establish his *prima facie* case of reverse gender discrimination, his claim would still have failed because, as discussed in the age discrimination discussion, the defendant has articulated a legitimate basis for the adverse employment action, and the plaintiff has failed to demonstrate that that explanation is pretextual.

15

## **CONCLUSION**

The plaintiff has failed to raise a genuine issue of material fact as to whether the defendant retaliated against him or terminated him on the basis of his age or gender. As such, the defendant's Motion for Summary Judgment will be granted.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge